# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| MICHELLE L. CALL, | ) |
| Plaintiff, | ) Case No. 1:04CV00110 |
| v. | ) **OPINION** |
| JO ANNE B. BARNHART, COMMISSIONER OF SOCIAL SECURITY, | ) By: James P. Jones<br>) Chief United States District Judge |
| Defendant. | ) |

In this social security case, I affirm the final decision of the Commissioner.

## *I. Background.*

Michelle L. Call filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for a period of disability and disability insurance benefits ("DIB") under title II of the Social Security Act, 42 U.S.C.A. §§ 401-433 (West 2003 & Supp. 2005) ("Act"). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g).

My review under the Act is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial

evidence exists, this court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Id.*

Call applied for benefits on June 23, 2003, alleging disability as of August 19, 2001, due to lower back pain. The plaintiff's claim was denied initially and upon reconsideration, and a hearing before an administrative law judge ("ALJ") was held on August 5, 2003. By decision dated August 21, 2003, the ALJ found that the plaintiff was not disabled within the meaning of the Act. The Social Security Administration's Appeals Council denied review, and the ALJ's opinion constitutes the final decision of the Commissioner.

The parties have filed cross motions for summary judgment and have briefed the issues. The case is now ripe for decision.

## II. Facts.

The plaintiff was thirty-one years old at the time of the ALJ hearing, a younger individual under the regulations. She has a ninth grade education and past relevant work experience as a certified nursing assistant and a sewing machine operator. The

plaintiff alleges disability due to a work related lower back injury. She has not engaged in substantial gainful activity since the alleged onset date.

James B. Stone, M.D., of Carilion Family Medicine, treated the plaintiff from August 20, 2001, through August 28, 2001. (R. at 86-91.) In an attending physicians report, Dr. Stone noted having first seen the plaintiff in the emergency room on August 15, 2001, due to a work related back injury. (R. at 90.) The plaintiff complained of back pain radiating down the back of the left buttock to the posterior thigh and knee. (*Id.*) Upon examination, Dr. Stone noted subjective tenderness over the left lower paralumbar vertebra opposite L5-S1. (*Id.*) Dr. Stone diagnosed acute back strain with possible sciatica. (*Id.*) On August 27, 2001, an MRI showed a relatively mild median to bilateral paramedian focal disc herniation extending three to four millimeters into the spinal canal. (R. at 86.) It was noted that it is adjacent to the exiting S1 nerve root but did not appear to directly contact or displace them. (*Id.*) Upon physical exam at the August 28, 2001, visit, Dr. Stone noted that SLR testing revealed that the right side was weakly sensitive at seventy to eighty degrees, that strength was equal, and sensation was diminished. (*Id.*) Dr. Stone diagnosis was a mild degenerative disc syndrome. (*Id.*)

The plaintiff received treatment at Highlands Neurosurgery, by Drs. Matthew Wood, J. Travis Burt, and John Marshall, from September 4, 2001, through March 3,

2003. The plaintiff was referred by Dr. Stone for complaints of back pain, left hip pain, and left lower extremity pain following a work related injury. (R. at 111.) On a September 4, 2001, visit, Dr. Burt recommended that the plaintiff pursue a lumbar epidural steroid block injection. (*Id.*) Dr. Wood, who saw the plaintiff on September 12, 2001, also recommended that the plaintiff pursue a lumbar epidural steroid block injection. (R. at 109.) The plaintiff received the injection and returned to Dr. Burt's office for a follow-up on September 26, 2001. (R. at 108.) The plaintiff reported only very brief relief of her back and left lower extremity pain. (*Id.*) Dr. Burt noted the diagnosis of left L5-S1 herniated nucleus pulposes with left S1 radiculopathy and the failure of conservative management to ameliorate her symptoms. (*Id.*) Due to persistent pain, in October 2001, the plaintiff underwent a left L5-S1 diskectomy and excision of a large disc free fragment. (R. at 123-24, 129-30.) On November 5, 2001, at a routine follow-up after the surgery, the plaintiff stated that her leg pain was still present. (R. at 107.) Dr. Burt recommended an MRI to rule out recurrent disc herniation. (*Id.*) The November 2001 MRI revealed recurrent disc herniation, and the plaintiff underwent another surgery. (R. at 116-22, 160-65.)

Dr. Burt's December 2001 physical examination revealed tenderness around the incision, decreased Achilles reflex, and some decreased sensation, but the plaintiff's motor strength was a five on a scale of five and her straight leg maneuvers

were unremarkable. (R. at 106.)  Thereafter, in January 2002, the plaintiff underwent another lumbar epidural steroid block injection, and Dr. William M. Platt diagnosed lumbar postlaminectomy syndrome and lumbosacral radiculitis. (R. at 166.) The plaintiff returned to Dr. Burt's office on January 28, 2002, for a follow-up visit. (R. at 105.) The plaintiff reported not having much relief and feels that the injection may have aggravated her symptoms. (*Id.*) Dr. Burt prescribed physical therapy for active/passive range of motion of the lumbar spine and lower extremities three times a week for two weeks. (*Id.*)

In February 2002, the plaintiff underwent another MRI. (R. at 114-15.) The MRI showed degenerative and post-operative changes at L5-S1, but the small focus of the anterior epidural soft tissue had decreased in size and did not result in any obvious neural impingement. (*Id.*) Dr. Burt noted there was no recurrent disc herniation whatsoever. (R. at 103.) After reviewing the MRI results, Dr. Burt prescribed physical therapy and pain medication. (*Id.*) He opined that the plaintiff "may return to work with no lifting over 10 lbs. [and] no repetitive stooping or bending. She should be allowed to sit and stand as needed." (*Id.*) An EMG study suggested probable subacute to chronic radiculopathy, but no plexopathy, peripheral polyneuropathy, or localized peripheral entrapment. (R. at 102.)

Also in February 2002 the plaintiff underwent a physical therapy evaluation by Michael Hamoy, RPT. (R. at 226-27.) The plaintiff was referred for evaluation and treatment to increase lumbar and lower extremity range of motion. (*Id.*) Upon physical assessment, Hamoy noted standing side flexion was slightly limited bilaterally with complaint of left lower back and hip pain; independent lower extremity weight bearing appeared to be unprovocative; lower trunk rotation moderately limited without significant complaint; passive leg raise on the left was twenty degrees with complaint of low back pulling; right passive leg raise to forty degrees with complaint of low back pulling. (*Id.*) He educated the plaintiff in regard to back care and postural support and provided a booklet to supplement the back care information and a detailed handout regarding some beginning home exercises. (*Id.*)

In March 2002, the plaintiff returned to Dr. Burt for a follow-up. (R. at 101.) Dr. Burt reiterated his limitations regarding the plaintiffs return to work. (*Id.*) Although the plaintiff complained of pain, there was no evidence of spasm, her reflexes were symmetric, and her straight leg maneuvers were unremarkable. (*Id.*)

In April 2002, a functional capacity evaluation was performed at the plaintiff's physical therapy services. (R. at 167.) The evaluator, a licensed physical therapist, indicated that the plaintiff gave a submaximal effort. (*Id.*) Given the test findings and clinical observations, the evaluator had considerable question as to the reliability

and accuracy of plaintiff's subjective reports. (*Id.*) Thus, the evaluator was unable to provide an accurate estimate of plaintiff's abilities and limitations. (R. at 168.)

On April 22, 2002, the plaintiff returned to Dr. Burt's office for a follow-up after the functional capacity evaluation. (R. at 100.) Dr. Burt endorsed the findings of the functional capacity evaluation and noted that the evaluation results were unreliable with many inconsistencies. (*Id.*) Dr. Burt specifically noted the "multiple Waddell signs reported pain rating with normal vital signs and markedly decreased grip strength which in no way is a result of her lumbar disc herniation." (*Id.*) Dr. Burt noted that the plaintiff was at maximum medical improvement with regards to her disc herniation and work related injury. (*Id.*) He also noted the plaintiff's prior work restrictions were now permanent. (*Id.*)

On May 29, 2002, Dr. Burt noted that his restrictions were unchanged, and he encouraged the plaintiff to keep her activities up and continue with her stretching exercises. (R. at 96.) He also noted that he had reviewed the February 25, 2002, EMG/nerve conduction study which demonstrated a reinnervation pattern. (*Id.*) In addition he re-reviewed the February 20, 2002, MRI which demonstrates no evidence of a recurrent disc and only epineural fibrosis. (*Id.*)

In November 2002 the plaintiff was evaluated by a psychiatrist, Linda R. Thompson, M.D., who rated the plaintiff as having a global assessment of functioning

- 7 -

Case 1:04-cv-00110-JPJ-PMS   Document 12   Filed 03/28/06   Page 7 of 15   Pageid#: 49

("GAF") of 60 with a previous GAF of 65, which indicated the plaintiff was functioning pretty well. (R. at 195.) Her mental status examination revealed a slightly depressed mood. (*Id.*) Attention-deficit/hyperactivity disorder was diagnosed, and bipolar II disorder was ruled out. (*Id.*)

The plaintiff received treatment in the Emergency Room of Smyth County Community Hospital on December 4, 2002, after being involved in a motor vehicle accident. (R. at 196-99.) The plaintiff was reportedly crying and complaining of back pain with no radiation to her legs. (R. at 196.) The diagnoses upon discharge were lumbar strain and history of lumbar disc disease. (*Id.*)

The plaintiff saw Dr. John Marshall of Highlands Neurosurgery several times from February 2002 to February 2003. (R. at 93-122, 224-25.) Dr. Marshall saw the plaintiff on May 1, 2002 for physiatric evaluation and pain management. (R. at 99.) The plaintiff reported that her back and legs hurt and burned and that she had difficulty sleeping. (*Id.*) She also stated that her employer would not bring her back to work and she asked "Do you think Dr. Burt will put me on disability?" (*Id.*) The plaintiff continued treatment by Dr. Marshall from December 18, 2002, through February 19, 2003, due to continued back pain, difficulty sleeping, and left low extremity pain/paresthesias. (R. at 224-25.)

A residual functional capacity ("RFC") assessment by Richard M. Surrusco, M.D., in December 2002 indicated that the plaintiff could lift twenty pounds occasionally and ten pounds frequently; could stand/walk about six hours; could sit for six hours in an eight hour day; was limited in her lower extremities in pushing and pulling; could never climb ladders, ropes, or scaffolds; could occasionally stoop, kneel, crouch, and crawl; and had no other limitations. (R. at 200-10.) A psychiatric review technique form ("PRTF") revealed that the plaintiff did not have a severe mental impairment. (R. at 211-23)

In March 2003, following the December motor vehicle accident, the plaintiff reported an increase in her symptoms to Dr. Burt. (R. at 93.) Dr. Burt noted upon examination that the plaintiff sits comfortably without problems. (*Id.*) He also noted that palpitation of her back demonstrates tenderness to direct palpitation but no frank spasms. (*Id.*) He further noted that he objectively identified no changes in the plaintiff's complaints and that the motor vehicle accident did not further impair her physical abilities. (*Id.*)

The plaintiff appeared and testified at the hearing before the ALJ. The plaintiff testified that she suffered an on-the-job lower back injury in August 2001 and that she has been receiving worker's compensation payments for the injury. (R. at 288.) She testified that she underwent two surgeries for her back and two epidural injections,

but that nothing helps. (R. at 289.) She testified that she is in constant pain and that she can carry no more than ten pounds. (R. at 289-90.) She testified that she cannot drive because she is too drowsy and dizzy from pain medication. (R. at 292.) She also testified that she experiences daily crying spells and that her depression is getting worse. (*Id.*) She also testified that her husband does the shopping and that her husband and sister help her with housework. (R. at 292-93) She testified that she needs to lie down daily for most of the day, but that she goes on job interviews in an attempt to find suitable work. (R. at 293, 297.) Finally the plaintiff testified that she has undergone psychological counseling for poor concentration, depression, and anxiety, but that she last saw a counselor in November 2002. (R. at 290-92.) The ALJ found that much of the plaintiff's testimony was unsupported as were her allegations of disability. (R. at 17.)

Also appearing and testifying at the hearing was vocational expert ("VE") Cathy Sanders. The ALJ asked Sanders if there were any jobs in the national economy that a hypothetical individual who was restricted to sedentary work activity with no repetitive stooping or bending, and with the necessity to sit or stand at the person's option, could perform. (R. at 299.) Ms. Sanders responded that there was a significant number of jobs in the national economy that such an individual could

Case 1:04-cv-00110-JPJ-PMS   Document 12   Filed 03/28/06   Page 10 of 15   Pageid#: 52

perform, such as an interviewer, information clerk, customer service worker, and administrative support worker. (R. at 299.)

Following a careful review of the documentary evidence and considering the testimony at the hearing, the ALJ found the plaintiff has severe musculoskeletal impairments, but that these impairments do not meet or medically equal a listed impairment. The ALJ determined that although the plaintiff is unable to return to past relevant work, she has the residual functional capacity to perform the exertional requirements of sedentary exertion as defined in the regulations. In addition, because of the plaintiff's musculoskeletal impairments she is additionally restricted on a non-exertional basis in that she should not engage in repetitive stooping or bending, but should be able to sit or stand as needed. The ALJ also determined that the plaintiff's allegations of an inability to work due to physical impairments, disabling pain, and mental impairments are not credible. Ultimately, the ALJ concluded that the plaintiff was not under a disability. In making this determination the ALJ relied on the testimony of the VE who opined that given Call's age, education, work experience, and residual functional capacity, there were various jobs existing in significant numbers in the regional and national economies that the plaintiff could perform.

*III. Analysis.*

The plaintiff contends that substantial evidence does not support the the ALJ's decision that she has no disabling impairments. Specifically, the plaintiff argues that the ALJ erred by not giving proper consideration to her complaints of pain. Contrary to plaintiff's assertion, the ALJ determined that Call was in fact capable of performing sedentary work with the noted limitations.

The determination of whether a claimant is disabled by pain or other subjective symptoms is a two-step process under the Act. *See Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996); 20 C.F.R. § 404.1529(b), (c), 416.929(b) (2005). First, there must be objective medical evidence showing the existence of an impairment that could reasonably be expected to produce the actual pain, in the amount and degree alleged by the claimant. *See Craig*, 76 F.3d at 594-95. Only after the existence of such an impairment is established must the ALJ consider the intensity and persistence of the claimant's pain and the extent to which it affects the ability to work. *See id*. Although a claimant's allegations about pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence. *See id*. at 595.

- 12 -

I find that the ALJ appropriately found the plaintiff's subjective complaints to be incredible given the objective evidence. The ALJ determined that the plaintiff had a medical condition which could cause the symptoms alleged, but concluded that the plaintiff's symptoms were not so severe as to prevent her from performing the exertional requirements of sedentary work. Indeed, the objective medical evidence does not support the plaintiff's allegations of disabling pain. Sedentary work requires lifting no more than ten pounds at a time and occasional walking and standing. The plaintiff's own treating physician, Dr. Burt, opined many times that, based on his clinical findings, the plaintiff could perform this level of work. (R. at 96, 100, 101, 103.) The ALJ accepted this assessment and presented the limitations suggested by Dr. Burt to the VE. Indeed, the ALJ assessed the plaintiff with a lower exertional capacity than the state agency physician, who opined that the plaintiff could lift twenty pounds occasionally and ten pounds frequently; could stand/walk for about six hours and sit for six hours in an eight hour day; was limited in her lower extremities in pushing and pulling; could never climb ladders, ropes, or scaffolds; could occasionally stoop, kneel, crouch, and crawl; and had no other limitations. (R. at 200-10.)

The April 2002 functional capacity evaluation provides further support for the ALJ's determination that the plaintiff's subjective complaints exceed the objective

evidence. The evaluator indicated that Call gave submaximal effort, and that he had considerable questions as to the reliability and accuracy of the plaintiff's subjective reports. (R. at 168.) Dr. Burt reviewed the evaluation, and noted its unreliability due to variable levels of physical effort and many inconsistencies. (R. at 100.)

In addition to the objective medical evidence, the plaintiff herself has indicated that she is capable of performing sedentary work. She testified at the hearing before the ALJ that she could lift ten pounds, and in a report to the agency she indicated that she could lift twenty-one to twenty-five pounds occasionally and could occasionally squat, bend, crawl, climb, and frequently reach. (R. at 48.) Plaintiff also admitted that her daily activities included walking, cooking for her children, folding laundry, ironing, occasionally washing dishes, going shopping, sewing, reading, and visiting with friends and relatives. (R. at 69-75.) Accordingly, I find that substantial evidence supports the ALJ's decision to discredit the plaintiff's subjective complaints of pain and find her capable of performing sedentary work with the limitations indicated by the ALJ.

### *IV. Conclusion.*

For the foregoing reasons, the Commissioner's motion for summary judgment will be granted.

An appropriate final judgment will be entered.

                                            DATED: March 28, 2006

                                            /s/ JAMES P. JONES
                                            Chief United States District Judge